We will adhere to the usual time limits. Appellant, you need to let me know how much time you will need for rebuttal. Call the case, please. Case number 12-2817, Jonathan Lewis et al. v. De Paul University. May it please the court. Ed Clinton, Jr. for the plaintiff's appellants. I would like five minutes for rebuttal time. Counsel, you're competing with LaSalle, so you have to keep your voice up. That is not a microphone. Okay, I'll try my best. Thank you. Thank you. Please proceed. This is a garden variety consumer fraud case in which the defendant is a law school. It had a promotional scheme to increase sales. The only unusual fact about this case is the prominence and reputation of the defendant, De Paul University. So De Paul misrepresented and falsified its employment information for a period of years to induce students to enroll at De Paul rather than some other school. Obviously, there are many legal issues that are present in the appeal, but I first want to address some areas where the trial court misunderstood and misstated the factual part of the case. So the decision is based on faulty premises. Page 4. Trial court says the complaint doesn't allege the employment information is false. That's not true. We do allege much falsity. Page 4. Well, you use the word false quite a bit throughout your complaint, but there are never any facts alleged as to the nature of the falsity. Yes, there are. There are plenty of facts. The facts are that De Paul is saying that 90% of the people are employed. When you read that information in the context of their disclosures, you're not aware that they're counting part-time people, they're counting temporary people, they're counting people who aren't working in the legal profession, they're counting people who really are struggling. So that's the falsity is what they're leaving out. Those are the examples of it. That's false. So you look at that and a reasonable person takes a look at that information. And remember, the salary information is listed right below. Salary information says they're claiming enormous average salaries here. I'm just looking at 2011, C328 in the record. So you look at that, you see a 92.8% employment. That's false because they're counting all these people who are unemployed in the law business. And then you look right below, it says average starting salary in private practice, $97,000. Salary statistics, they're only counting the salaries they choose to count. They're not counting the part-time people, people who they funded. They're not counting all those other people. That's the falsity right there. And the crux of your damage claim is that your clients believed that they would secure employment following law school sufficient to service the debt that they were undertaking, right? Not quite. No, slightly different. My clients believed that they were attending a law school, reasonably believed, it's our position, that had a 90% employment rate or an 88% employment rate. If you look at the stats, you see an 88% chance of getting a good job. At the time they enter. That's right. I understand these are past facts. It's a past track record. So they say they're comparing that to another law school, but they're really getting a law school education where the real employment rate is about 40%, 40% to 50% throughout the litigation period. Even to today, DePaul University has not cracked 50%. Have you alleged that type of figure in your complaint? We did not allege the actual employment rate. We need discovery to allege the actual rate. What we need to look at is the four corners of the complaint. And even this morning I think you're citing something that isn't fully in your complaint. Yes, it is. It's in the record. We cited to it. We cited to it. Is it in the complaint? It's not. DePaul provided in the record. It's been in the record. It's been discussed. I have no objection to DePaul including their employment data on the record. This has been part of this case from the beginning. That's the whole point. They're computing employment stats. They're cutting all those people out who they don't want you to know about. And the student looks at that, a reasonable person, looks at that data and says I have a good chance of getting a good job. This school is doing well. That's what a reasonable person says. I have a good chance of getting a good job three or four years from now. No question. No question it's three or four years. That's the projection you're saying DePaul made. You back off promissory fraud. But you're saying a reasonable person would believe that these employment statistics are a projection by DePaul of your likelihood of getting a good paying job on graduation. It's a reflection of past graduate success. And DePaul spends enormous effort getting students to believe this stuff. They do all kinds of effort to say we're better than this other law school over here. Our degree is better. You're going to do better in the world. It applies in good times and bad. They're saying we have a better track record. We have a better reputation. Employers regard our graduates highly. Employers are snapping up our graduates. It's not really true. You're making statements that are in your complaint. The complaint doesn't compare the statistics of any other laws. No, it's in there, though. It's in the complaint. I've alleged that. I've alleged that in the complaint. I've laid that out. Where is it, counsel? I haven't alleged any other law school, but I've alleged that's how students are evaluating the data. That if they had known that they were attending a school with a lower employment rate, they wouldn't have attended. That's the point. Well, you say they wouldn't have attended DePaul. You're not saying they wouldn't have gone to law school. True. That's true. So they would have incurred the debt they ultimately incurred anyway. Possibly. We don't know. That's for the finder of fact. I'm going by the allegations of your complaint. Nowhere in the complaint do the plaintiffs claim that had they known the truth about DePaul, they wouldn't have gone to law school. Well, they say they wouldn't have attended. Let's just look at Shelly Taylor. Had Taylor known the employment information was incomplete, false, and materially misleading, Taylor would not have enrolled or continued her enrollment at DePaul. I mean, she would have left law school. That's what she's saying. She's not saying she was attending another law school. She's not. None of the plaintiffs allege I would not have gone to law school. You actually just said that's not what you're alleging, that they wouldn't have gone to law school. I mean, I guess we have a difference of opinion here. I mean, she's saying she wouldn't have enrolled or continued to be enrolled at DePaul. I mean, isn't it? I mean, that's what we've alleged. I mean, I don't know what else to tell you. I mean, the students say if we knew the truth, we wouldn't have gone. We would have done something else with our lives. We would have done something else. I'm not sure that's a fair characterization of the amended complaint. So you think we're saying that they would have gone to another law school? Maybe. But the other law school could have had a better track record than DePaul had. That's the point. And they don't allege that they had the option to go to a better law school. That's true. We don't. That's true. We don't allege that. But that's the nature of, you know, I think we've covered what we're alleging. That's the nature of it. I do want to go back to, you know, we're not claiming that DePaul, we've never claimed, no one in any of these cases has claimed that the law school promised them a job. We've never claimed that. We've said you had a false track record that made it impossible for the student, prospective student, to evaluate his or her chances. That's important. It made it impossible to project their chances of success. Their chances for success. Right. Isn't that opposite of what you're really? No. I believe that your complaint is saying, based on these statistics, they projected that they would get better jobs than they got. They projected wrongly because the stats weren't right. Right. But it's really impossible if you don't get the true information. If people don't tell you the truth, you can't make your own projection. We're not saying DePaul promised a job. That's been DePaul's position in the litigation. They say we're claiming that we didn't get a job. No. We're saying you, DePaul, didn't tell us the truth about your past track record so that we, students, could identify our possibilities for the future, could make our reasonable conclusions as to what we wanted to do. Your theory of damages is, at least in part, that they should be measured by the statistics that DePaul provided. Correct. Multiplied by a factor, that being what the actual statistics should have been. And so that, to me, translates into they guaranteed me a job. They gave me a 92% guarantee that I would be employed within nine months in a high-paying job. The truth is I only had a 50% chance. And so that's the measure of damages. It's only one of the measures I provided. I'm not obligated at the pleading stage to provide all the detail of my damages, but that's one of several options I provided. The other option is you take statistics, you take two cohorts, you take the people who attended law schools with the employment stats of the real DePaul, 50%-ish, more or less, and then you compare those to the people who attended law schools with the track record that DePaul claimed to have. That's what I've also claimed. Obviously we're starting out, but we're not claiming that someone promised a job we never did. None of these cases are about that. These cases are about false facts, a false track record, so the student can figure out what his or her options are going forward if they go to that school. Counsel, we addressed the issue of proximate cause. Where is the cause and fact in this case? The proximate cause is the students relied on the data. They say that they wouldn't have gone to DePaul if they hadn't, if they'd known the true facts, they would have done something else. You say they would have done another law school, that's fine. That's the cause of their being enrolled. But here's the damage. Here's how the damage works. Are there not a multiplicity of causes that could have yielded the same result, and are you not bound to show that DePaul's representation was, in fact, the cause of these individuals not being able to secure the employment that they thought they were entitled to? No, I don't quite agree with you. What I'm proposing, what I will propose if the case proceeds, is a statistical analysis where you take the cohorts, because there's plenty of evidence, there's peer-reviewed research, some of which we've cited in our papers, that shows you can measure the value of a law degree. There's peer-reviewed research that shows you can measure a value of a law degree from a particular institution. There's also plenty of economic data and research and statistics that show you can measure the effect of where you start has a big impact on where you end up. That's a huge impact. Where you start is important to where you end up. And you take those things, and you need an expert, but the expert says, the people who came from law schools that had the track record that DePaul claimed to have earned X. And these students have earned less. Why? That's the proof. It's statistical analysis. Again, some of the cases that are cited are from times when things weren't this sophisticated. But there is a mountain of peer-reviewed research that has appeared on these questions. So that's how you calculate it. Now obviously the students don't have an earnings track record. When they walk out the door, they've passed the bar, and away they go. But the Illinois courts have awarded damages to minors and other people based on statistical cohorts, how the statistical groups do. Illinois courts have recognized this for a long time. So that's our damages. Our damages is that we started out lower than we thought we would, and we earned less over time because of that. We thought we were getting a degree that offered us this, but we really got a degree that offered us that, meaning a much lower employment rate. A degree that offered us a much lower chance of getting a job in the legal business, requiring a law degree. And the individual characteristics of any given student are irrelevant in that calculation? No. That's for the statisticians to argue about. Obviously there are always individual differences. I mean, whether the case can be a class action or not, those are all for the future. But no, that could be relevant to this issue. It could be. But again, the statisticians can show you how cohorts of people do, and they can go through that. And they've gone through it for minors, for people with no track record. There's no reason to think that the students here, that we couldn't make that same showing. There's a mountain of peer-reviewed research on this topic, because this whole thing, this DePaul situation, is a small piece of a big national scandal that went through the whole law profession. It started in 2011. It caused all kinds of things to happen in the legal profession, all kinds of problems. So unless my colleagues have further questions, your time has expired. Okay. Thank you. May it please the Court, my name is Lawrence DiNardo. I represent the Eppley DePaul University in this case. DePaul University promised the plaintiffs an education in exchange for tuition. And because that's exactly what DePaul provided these plaintiffs, a fraud case cannot be properly brought. They all received their appropriate instruction, took and passed the bar exam, and are licensed and admitted to practice law. An essential element of the fraud claims is injury. They have to have been injured by the claimed misrepresentation. And they simply were not injured. Cases like the City of Chicago v. Michigan Beach Housing makes that clear. For a sustainable claim, there must be an injury. This will be the third appellate court that faces these issues, precisely these same issues involving law schools, the same attorneys bringing these claims, complaining about these statistics. The Sixth Circuit, United States Court of Appeals for the Sixth Circuit, last year in the Thomas Cooley Law School case, affirmed the dismissal of precisely these claims because the statistics complained about the percentage of prior graduates employed after nine months and the salary information according to the Sixth Circuit Court of Appeals. Exactly the same information here, virtually in the same format. The court said those statistics are objectively true. But when you match up a 90-plus percent employment rate within the first nine months of graduation against an average salary without disclosing that that's for full-time legal employment, doesn't that create a misimpression? Well, the Sixth Circuit certainly addressed that, and the Sixth Circuit said, first as to the basic statistic, the 92 percent in this particular case, for example, that that is objectively true. Employment means employment. It doesn't say full-time legal employment. It says employment. And any reasonable reader would not read into that simple statement, 92 percent employed, to mean only legal employment at a high salary. But you've got applicants who are taking on, according to the complaint, upwards of $100,000 in debt to obtain this degree. Now, they're not spending $100,000 so that they can go out and be waitresses and work in retail. Certainly not, right. So when a law school is reporting we have a 92 percent success rate in our graduates obtaining employment following law school, wouldn't a reasonable reader believe that we're talking about relevant employment to this very expensive degree I'm taking on? So I think they might in isolation. The next bits of information, though, are that 90 percent includes, so in this record, that 90 percent includes 50 percent in private practice, 30 percent in business, 15 percent working for the government, and there's three or four more categories, public service, unknown. So the next breakdown tells you these are not all private law firm jobs. And then below the average salaries, there's a range. So in this case, in the two reports in the record, one, the range is a low of $20,000 to a high of $250,000. The other range is a low of $25,000 to a high of about $190,000. Judge Cohen said you can't look at that and say that employment statistic must mean full-time private practice. It says $20,000 is the range. And that's what the Sixth Circuit said. A reasonable reader, and to the point that this is an expensive purchase you're about to make, inquires further. And if that reader doesn't, you don't hold the person who made, yes, a rather general representation, you don't hold that person responsible. The reader has an obligation before making a reasonable reader to dig a little bit. And, of course, the official guide that the ABA published for each of the years at issue here says, here's the law school report. Understand those jobs include not just full-time but part-time jobs, not just legal jobs. They include retail jobs. Now, does someone about to make a $100,000 purchase faced with objectively true but admittedly general information, what the ABA required the law schools to publish, do they leave it at that? Well, court after court has said now, no, that's not a reasonable. That's what the Sixth Circuit said in the Cooley case, the appellate court in New York, in the Gomez case a year before. Counsel, when we examine the issue of consumer fraud, intent is an issue, one of the factors. So what would have been the intent of representing that 92% employment could be obtained by graduates? Each of these law schools are subject to accreditation by the American Bar Association Committee on Legal Education. This is not a choice they have. That committee, an independent arm of the ABA, an arm that acts as an agent for the United States government, instructs those law schools as to what they must put in their materials. They instruct that the overall employment number nine months after law school, for whatever it's worth, Your Honor, and admittedly, it's a general statistic that doesn't inform very much, but it's what the ABA required. So their intent, if you will, is to report the statistic. They're obligated to report which is the same statistic the other several hundred law schools are obligated to report. So, yes, are they interested in attracting students? Of course they are. But without regard to that interest, they also must comply with the directive of the ABA. But nothing in the ABA official guide or in the ABA standards prohibited the law schools from reporting more information. They certainly could have reported more. So when automobile manufacturers had to report average mileage, they reported average mileage. When the government said we need city mileage and highway mileage, they reported city and highway. It doesn't mean the first reports were fraudulent. They were what was required. They required further examination. But weren't they deceptive? They weren't deceptive, Your Honor, because on their face they tell us two things. First of all, they're true, and it's not alleged that that number is a false number. But secondly, the reasonable consumer about to make a large purchase doesn't look at a number that says 92 percent employed after nine months and say, great, I can assume that means a high-paying legal job that I'm going to desire, especially when they see salary ranges. Aren't you expecting them to engage in legal reasoning prior to you teaching them what that means? Well, we would hope they'd be capable of that, Your Honor, certainly. But I think we're expecting that. And, again, a long number, many courts have come to precisely that conclusion. You can't walk away from those statistics with your eyes closed and say, I can read into that a series of assumptions that I want to read into that. So as I said, the New York court in a 5-0 decision upheld a dismissal as to New York law school. The 92 percent was really 92 percent of the people who returned the surveys. Absolutely. So isn't there something there that is somewhat misleading, if not misleading? I would say as to that point, it's fairly obvious that it's not an independent investigation. It says 92 percent of our former students reported employment. So it actually, in the text of the DePaul, the disputed statistics, it says reported. In one of these other cases, they use the term survey. And, of course, the official guide says understand prospective students, the ABA official guide. This is survey data. So DePaul never actually said 92 percent are employed. They said nine months after graduation, 92 percent of the respondents said they were employed. You're going to get more reports from people who are employed, are you not? I'd be a lot more prouder to fill out a report to say I'm employed. Same thing as to the salary. And that, again, in the official guide, the ABA official guide, it says be cautious. These salaries are not the salaries to be expected widely, the salaries you're reading about. There's a fair amount of advice to those who are interested in not looking at an opaque statistic, if you want to refer to it as that, and coming to the conclusions that they want to come to. I want to suggest that leave to amend here would be futile. That is, leave to amend the amended complaint. Absent an injury, that is, someone not receiving what they were promised, you can't make out a fraud case. Absent objectively false statements, and in this case I would submit unreasonable reliance, and at best a subjective misunderstanding that requires setting aside any sort of deductive reasoning, you can't make out a case. You can't determine damages that are proximately caused by the fraudulent conduct here. And a word about proximate causation. Our courts, I'm trying to think of the name of the case, but I think it's this Adler versus the William Blair case, make it clear that we are talking about proximate causation of the damages you're claiming. So we are talking about loss causation. So you have two separate elements that we shouldn't conflate. The representation has to cause you to act. In this case, to enroll or remain enrolled. That's one aspect of the misrepresentation. The second aspect is it has to be a fairly direct cause of the damages you're claiming. So here the theory would be reporting the 92% statistic about a prior class is a direct cause of me, in this case the two elements of damage, paying an incremental higher amount for law school and having a diminished future earning capacity. There is simply no possible connection between how prior law students fared in general employment and the price of tuition or future earnings capacity. So there is a fatal proximate cause. There's a fatal proximate loss causation in this case. And allowing another amendment is not going to change that. And then I should mention, plaintiffs, of course, did amend once before we filed our motion. Then after we filed our motion and raised these issues that have been, as I said, faced by numerous courts before, there was no request to amend then. There was no attempt to meet those deficiencies. Then after the court issued its opinion, there was no request to amend. There was no suggestion that it could be cured this way or that way. So you can hardly have an abuse of discretion where a court's not asked to exercise discretion or at least pointed in a direction where a solution, a sustainable solution, is suggested. But again, at the end of the day, you can't amend around these fatalities. So how do you determine, and each of the appellate courts that have looked at this have come to the same conclusion as did Judge Cohen in this case, how do you determine the ascertainable damages in a case such as this? Numerous courts have said you can't do this. Even if you approach the value of a law degree as solely an economic matter, which is a questionable proposition to begin with, doesn't it have intrinsic value to those who decide to become lawyers? But assume you approach it as an economic value. Isn't it idiosyncratic? Isn't the value of a law degree highly individualized? Doesn't it depend on countless circumstances beyond the control of default? Doesn't it depend on how you apply your training, what sort of practice you go into, what geography you decide to practice in, career and lifestyle decisions, and the economy, a host of issues that cannot be resolved. And our courts have made it clear that such speculation in assessments of damages just kills the claim. And as I said, the proximate causation problem cannot be solved. It's not sufficient, and this is from the City of Chicago-Michigan beach housing case and the Adler-William Blair case. It's not sufficient that the misrepresentation caused you to act, in this case to enroll. The misrepresentation must be loss causation, LOSS. But for that claim to misrepresentation, I would not have suffered the damages I'm claiming, the higher tuition and diminished future earnings. There's no amount of amendment that can change that. I see my time is up. Thank you, Your Honor. I don't want to walk away if there are any questions. Any questions? Thank you. Thank you, Counsel. Rebuttal? Just a few points, Your Honor. You know, DePaul talks about there's an ABA book that's cited in the record, and they've printed parts of the book, extracts of it, for several years. I want to say that DePaul itself did not comply with the ABA guidelines in those years, 2006 through 2011. ABA has numerous categories, including non-legal careers for lawyers. That's a key point, and it's at C-584. For six years, DePaul doesn't list anyone, not one student, who had a non-legal career. So they didn't meet the ABA's template. It's not listed in the amended complaint, is it? That's correct. It's not. But it's in the record. I mean, that's correct. It's not. But they didn't meet the ABA standards either. So, I mean, we're, you know, I mean, that's why we asked for leave to amend. I mean, that's the whole point. Did you ask for leave to amend in the trial court? Not in writing. Not in writing. Not in writing. Is there any transcript where you said, Judge Collin, we have your decision. We asked for relief as justice requires. That's all. That's all we asked for. You know, to talk a little bit about, you know, some of these cases have fallen into a trap. You know, the Cooley cases and the cases involving the New York cases have fallen into the trap of saying that there was some other place the students could have gone to find the true employment rate. That is a myth. That's an urban legend that just unfortunately deceived some well-respected and very capable jurists. There isn't. All the data comes from the school. You are stuck with the data. It's the same in the ABA book. It's the same in their website. It's the same in U.S. News. So the data stays the same. There is no place where you can figure that out. And then, you know, DePaul, they talk a little bit about, they say, well, there's a salary range. That's true. There's a salary range. That's 2010-11. They say $25,000 to $190,000. Their lawyers are making, their full-time lawyers are making $25,000. So that doesn't tell me anything useful. But the student is going to look at that $97,056 or the $74,267. That's the purpose. And then the two groups of stats are made up differently. You have everybody here when you look at the employment information, and you have a small group here for the salary statistics. That's the deception. That's not fair to the students. Again, I think the statisticians can argue about where the students come out. Finally, you know, DePaul argued a little bit about the ABA. The ABA is not the government. All they are is crediting law schools for the purpose of letting them take financial aid from government-based loans. That's it. That's all they do. They're not the U.S. government. The law schools have tried to raise the ABA on a pedestal. The ABA doesn't claim for itself. Finally, I mean, we have, you know, I mean, fundamentally, we have a good institution in DePaul Law School that made a series of mistakes. But the clients that I represent were harmed by that. They suffered. They are suffering now. They have every right to relief. Thank you. Thank you, counsel. This matter will be taken under advisement. This court is adjourned.